# United States Court of Appeals for the Federal Circuit

---

**SHELL OIL COMPANY, ATLANTIC RICHFIELD COMPANY, TEXACO, INC., UNION OIL COMPANY OF CALIFORNIA,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2020-2221

---

Appeal from the United States Court of Federal Claims in No. 1:19-cv-01795-CFL, Senior Judge Charles F. Lettow.

---

Decided: August 4, 2021

---

MICHAEL W. KIRK, Cooper & Kirk, PLLC, Washington, DC, argued for plaintiffs-appellees. Also represented by JOSE JOEL ALICEA, VINCENT J. COLATRIANO.

STEPHEN CARL TOSINI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BRIAN M. BOYNTON, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

---

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

This case has been before us on four prior occasions. At issue is the government's obligation under World War II-era contracts to indemnify Shell Oil Company; Atlantic Richfield Company; Texaco, Inc.; and Union Oil Company of California (collectively, "the Oil Companies") for environmental remediation costs they incurred due to their production of aviation gasoline ("avgas") for the war effort. We have held that the government is contractually liable to reimburse these costs. *Shell Oil Co. v. United States*, 751 F.3d 1282, 1293 (Fed. Cir. 2014) ("*Liability Decision*"). And we have confirmed that the government's contractual obligations encompass all of the remediation costs that the Oil Companies have incurred. *Shell Oil Co. v. United States*, 896 F.3d 1299, 1310–11 (Fed. Cir. 2018) ("*Damages Decision*"). Consistent with those decisions, in 2019, the government reimbursed the Oil Companies for the remediation costs incurred through November 2015, and interest thereon.

Because remediation efforts remain ongoing, the Oil Companies filed suit in the United States Court of Federal Claims ("Claims Court"), seeking damages for additional remediation costs incurred between November 2015 and November 2019, and for interest related to those costs. The Claims Court found the government liable for remediation costs incurred from November 30, 2015 through September 30, 2019, as well as interest accruing through the date of final payment. *Shell Oil Co. v. United States*, 148 Fed. Cl. 781, 796–97 (2020) ("*Shell II*"). The government appeals from that decision, arguing that: (1) res judicata bars the Oil Companies' claims for damages; and (2) the Claims Court erred in finding that it had jurisdiction over the Oil Companies' claims under the Contract Settlement Act of 1944 ("CSA") and, thus, erred in awarding interest under the CSA. We disagree with the government on both points

and affirm the Claims Court's decision.  In doing so, we hope to put an end to the government's continued resistance to making payments we have found it is obligated to make.

## I. BACKGROUND

### A. The Avgas Contracts

During World War II, the United States needed large quantities of avgas for use in airplane engines.  Avgas became "the most critically needed refinery product during World War II." *Damages Decision*, 896 F.3d at 1303.  "[T]he Government recognized the need to quickly mobilize avgas production . . . stating: 'It is essential, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses be increased immediately to the maximum.'" *Liability Decision*, 751 F.3d at 1286 (emphasis omitted).  Accordingly, between 1942 and 1943, the government, through the Defense Supplies Corporation ("DSC"), entered into contracts with the Oil Companies to facilitate avgas production ("the Avgas Contracts").

The Avgas Contracts required the Oil Companies to rapidly "expand avgas production facilities" and "sell vast quantities of avgas" to the government with an artificially low profit margin between six and seven percent.  *Id.* at 1286 n.3, 1286–87.  "The Oil Companies agreed to the avgas contracts' low profits in return for the Government's assumption of certain risks outside of the Oil Companies' control."  *Id.* at 1296.  As relevant here, the government agreed to reimburse the Oil Companies for "*any new or additional* taxes, fees, or *charges*" which the Oil Companies "may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the [avgas]." *Id*. at 1287.

The Oil Companies' performance of the Avgas Contracts helped to increase the country's avgas production from 40,000 barrels a day in December 1941 to 514,000 barrels a day by 1945. *Id.* at 1287. It is undisputed that the increased avgas production during the war led to increased amounts of acid waste. Although there was technology to reprocess acid waste, and the Oil Companies did, in fact, reprocess much of the waste, there was a massive amount of waste that overwhelmed the existing reprocessing facilities. And, although the Oil Companies asked the government to construct new facilities, the government refused, prioritizing avgas production over the transportation of acid waste for reprocessing and over the construction of additional reprocessing facilities. *Id.* at 1288.

As a result, the Oil Companies entered into contracts with an individual named Eli McColl to dispose of the acid waste at what became known as the McColl site in Fullerton, California. The Oil Companies disposed of acid waste at the McColl site from 1942 until shortly after the war ended in 1945, when the need for avgas plummeted and the government terminated the contracts. *Id.* "The McColl site closed on September 6, 1946." *Damages Decision*, 896 F.3d at 1304.

### B.  The Prior Litigation

In 1991, forty-five years after the McColl Site closed, the United States and the State of California filed suit against the Oil Companies under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*, in the United States District Court for the Central District of California, seeking to require the Oil Companies to pay cleanup costs arising from the acid waste generated during World War II pursuant to the Avgas Contracts. The Oil Companies counterclaimed against the United States, asserting that the government should be held liable for the CERCLA costs.

The district court first found both the Oil Companies and the United States jointly and severally liable. *United States v. Shell Oil Co.*, 841 F. Supp. 962, 974–75 (C.D. Cal. 1993). But the court later allocated all of the cleanup costs to the government as an "arranger" of the disposal. *United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1030 (C.D. Cal. 1998).

On appeal, the Ninth Circuit affirmed the district court's decision that the government was 100% liable for the cost of cleaning up the benzol waste (which was about 5.5% of the waste) at the McColl site, but reversed its decision that the government was liable as an "arranger" for the non-benzol waste. *United States v. Shell Oil Co.*, 294 F.3d 1045, 1048–49 (9th Cir. 2002). Specifically, the court found that the government "was the end purchaser of avgas, and was thus more like a customer of the [avgas] manufacturers than like the manufacturers themselves." *Id.* at 1056. Given the Ninth Circuit's holding on "arranger" liability, the Oil Companies have borne nearly all of the clean-up costs incurred since 1994.

After remand from the Ninth Circuit, the district court transferred the Oil Companies' indemnification counterclaims to the Claims Court. The Oil Companies voluntarily dismissed the transferred counterclaims without prejudice so that they could first exhaust their administrative remedies. The Oil Companies submitted to the General Services Administration ("GSA") (the successor to DSC) a termination claim pursuant to the CSA, seeking reimbursement under the Avgas Contracts for environmental remediation costs at the McColl site. GSA denied the claim in 2006.

On February 24, 2006, the Oil Companies filed suit in the Claims Court, seeking reimbursement of the CERCLA cleanup costs from the United States. The court granted summary judgment in favor of the Oil Companies, finding the government liable under the Avgas Contracts for all cleanup costs at the McColl site. *Shell Oil Co. v. United*

*States*, 80 Fed. Cl. 411, 420 (2008).  We vacated that judgment on appeal because the judge to whom the case was assigned had a financial conflict of interest.  *Shell Oil Co. v. United States*, 672 F.3d 1283, 1290–91 (Fed. Cir. 2012).

On remand, the case was reassigned, and the Claims Court again granted summary judgment in 2013, this time in favor of the government.  *Shell Oil Co. v. United States*, 108 Fed. Cl. 422, 448 (2013).  This court reversed, holding that "[t]he plain language of the new or additional charges provision thus requires the Government to indemnify the Oil Companies for CERCLA costs incurred 'by reason of' the avgas contracts."  *Liability Decision*, 751 F.3d at 1293.  We remanded the case for the Claims Court "to determine how much acid waste at the McColl site was 'by reason of' the avgas contracts."  *Id*. at 1303.

The Claims Court held a trial on damages in early 2016.  Following that trial, the court found that "all of the acid waste disposed of at the McColl Site was 'by reason of' the Avgas Contracts," and awarded the Oil Companies $99,509,847.32 in damages.  *Shell Oil Co. v. United States*, 130 Fed. Cl. 8, 34 (2017) ("*Shell I*").  This amount represented 100 percent of the costs that the Oil Companies had incurred at the McColl site through November 30, 2015, plus the interest on those costs through the date of judgment.

In July 2018, we affirmed the Claims Court's judgment.  The government did not seek rehearing en banc.  Nor did it petition the Supreme Court for a writ of certiorari.  The judgment in favor of the Oil Companies became final, and the government paid the Oil Companies in April 2019.

## C. The Present Litigation

Remediation of the McColl site remains ongoing.  At this stage, the dispute between the parties involves: (1) cleanup costs the Oil Companies have continued to

incur since November 30, 2015, the end of the period addressed in the 2016 damages trial; and (2) interest that continues to accrue on those costs. The Oil Companies submitted a formal demand for these costs and interest to GSA in July 2019, but received no response.

On November 22, 2019, the Oil Companies filed this action in the Claims Court pursuant to Section 13(c)(2) of the CSA, 41 U.S.C. § 113(c)(2). The complaint alleged that, between December 1, 2015 and September 30, 2019, the Oil Companies paid an additional $1,543,840.68 to the contractor overseeing remediation at the McColl site, and $69,300.00 to the contractor providing security at the site—a total of $1,613,140.68. J.A. 389. The Oil Companies sought reimbursement of those costs as well as interest accruing through the date of payment pursuant to the CSA.[1]

The Oil Companies moved for summary judgment soon after filing the complaint, and the government filed a response and motion to dismiss. On June 29, 2020, the Claims Court issued its decision granting both motions in part and denying them in part. The court concluded that the government was liable under the Avgas Contracts for the continuing cleanup costs and that the Oil Companies were "entitled to indemnification and associated interest through the date of payment for remediation costs incurred after November 30, 2015 through November 15, 2019,"

---

[1]    The CSA provided that federal agencies shall "pay interest on the amount due and unpaid from time to time on any termination claim under a prime contract at the rate of 2.5 per centum per annum for the period beginning thirty days after the date fixed for termination and ending with the date of final payment." 41 U.S.C. § 106(f) (repealed 2011).

which remediation costs amounted to approximately $1.6 million. *Shell II*, 148 Fed. Cl. at 785, 796.[2]

In its decision, the Claims Court concluded that res judicata did not bar the Oil Companies' claim for costs incurred after November 30, 2015, and related interest on those costs. *Id*. at 790. The court agreed with the Oil Companies that their claims were "not barred by res judicata because they fall within a partial breach exception to general claim preclusion principles." *Id*. As the court explained, "the general rule is that when one party has performed its duties under a contract and the other party's obligations are ongoing, a breach by the latter party must be considered partial." *Id*. at 791. Applying this principle, the court determined that "the oil companies' initial lawsuit must be classified as a suit for partial, not total, breach insofar as it sought indemnification for past cleanup costs at the McColl site." *Id*. Specifically, the Claims Court explained that, "when '[t]he [g]overnment breached its contract 60 years after the [o]il [c]ompanies had finished performing under the [a]vgas [c]ontracts,' they stood 'in the position of an annuitant or a creditor exacting payment from a debtor' and as such were 'compelled to wait for the installments as they severally mature.'" *Id*.

The Claims Court rejected the government's argument that "the oil companies cannot now characterize the prior claims as claims for a partial breach when they originally elected to plead a total breach, thereby merging their demands for future damages into the judgment awarding

---

2    The Oil Companies also sought approximately $5.7 million in post-judgment interest "accrued through the date of payment on the charges awarded" in *Shell I*. *Shell II*, 148 Fed. Cl. at 792. The Claims Court held that the Oil Companies were not entitled to that interest because they failed to seek it in *Shell I*. Id. at 792–93. The Oil Companies have not appealed that decision.

past damages." *Id*. The court explained that, "even if the oil companies in their complaint in the prior action had sought future costs, plaintiffs could not effectively elect to treat their claims for future costs as part of a total breach." *Id*. Indeed, "contract law precludes recovery for speculative damages," and "an attempt by the oil companies at the time of the first suit to project future costs they might (or might not) incur" could only be described as speculative. *Id*. (citation omitted). As such, the court concluded that "those claims for speculative future damages did not merge into the judgment rendered but were simply put aside and not reflected in, or addressed by, the judgment." *Id*.

Next, the Claims Court held that it had jurisdiction under the CSA (and thus could award interest provided under that statute) notwithstanding the partial repeal of the CSA in 2011, "because the rights and duties of the parties had matured before" the repeal. *Id*. at 793. In doing so, the court rejected the government's argument that any "duties" it may have had could not have "matured" until the Oil Companies submitted their formal claim for reimbursement in 2019.

The court held that:

> [u]nder the plain language of the agreements, the government's duty to pay any new or additional charges the oil companies incurred by reason of the production of avgas was not contingent on the oil companies' act of seeking reimbursement, but instead upon their incurrence of new liabilities dictated by federal law. The agreements thus indicate that the government's duty to pay arose at whatever time the oil companies became liable to pay charges required by CERCLA due to their production of avgas—and both parties agree that that happened, at the latest, when the oil companies were found liable for remediation at the McColl site in the 1990s, well before the CSA's repeal. That no

> breach could occur until the oil companies de-
> manded performance is irrelevant to whether the
> government previously had an existing duty to
> eventually perform.

*Id.* at 794.

The Claims Court therefore concluded that the Oil
Companies were entitled to indemnification for remedia-
tion costs incurred at the McColl site from November 30,
2015 through September 30, 2019, plus interest on such
costs, accruing through the date of final payment, at the
rate and terms specified in 41 U.S.C. § 106(f). *Id.* at 796–
97.

The government timely appealed. We have jurisdiction
pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

We review a Claims Court decision granting summary
judgment de novo. *1st Home Liquidating Trust v. United
States*, 581 F.3d 1350, 1355 (Fed. Cir. 2009). Summary
judgment is appropriate if, when viewing the evidence in
the light most favorable to the nonmoving party, the record
indicates that there is "no genuine issue as to any material
fact and that the moving party is entitled to judgment as a
matter of law." *Id.* (quoting R. Ct. Fed. Cl. 56(c); Fed. R.
Civ. P. 56(c)).

On appeal, the government argues that the Claims
Court made two reversible errors. First, the government
argues that the court erred when it "failed to apply res ju-
dicata to redundant costs in this case (*Shell II*) that the oil
companies sought in their 2005 administrative claim." Ap-
pellant's Br. 11. Second, the government maintains that
the court misinterpreted the savings clause of the CSA's
repealer statute. According to the government, the court
should have found that "the long-repealed CSA did not ap-
ply because no 'rights and duties' had 'matured' as of the

effective date of the CSA's repeal." *Id.* We address each issue in turn.

## A. Res Judicata

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Cromwell v. County of Sac.*, 94 U.S. 351, 352 (1876)). Res judicata applies where "(1) there is identity of parties (or their privies); (2) there has been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1372 (Fed. Cir. 2013). "The doctrine of res judicata rests at bottom upon the ground that the party to be affected . . . has litigated or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction." *Richards v. Jefferson Cty.*, 517 U.S. 793, 797 n.4 (1996). A judgment is generally res judicata "not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit." *Heiser v. Woodruff*, 327 U.S. 726, 735 (1946).

We have recognized a partial breach exception to general claim preclusion principles. *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1377–78 (Fed. Cir. 2005). Where a breach is partial, "the injured party may recover damages for nonperformance only to the time of trial *and may not recover damages for anticipated future nonperformance.*" *Id.* at 1376. That is so because "prospective damages for anticipated future nonperformance resulting from the same partial breach" are "highly speculative," and contract law precludes recovery for speculative damages. *Id.* Accordingly, we have held that, "[w]hen a party sues for partial breach, it retains its right to sue for damages for its remaining rights to

performance." *Id*. at 1377.  That is, "in a case involving a continuing or recurrent wrong," "[a] judgment in an action for breach of contract does not normally preclude the plaintiff from thereafter maintaining an action for breaches of the same contract that consist of failure to render performance due after commencement of the first action." *Id*. (quoting Restatement (Second) of Judgments § 26, cmt. g).

Here, the Claims Court noted that, "when one party has performed its duties under a contract and the other party's obligations are ongoing, a breach by the latter party must be considered partial." *Shell II*, 148 Fed. Cl. at 791. The court explained that "the oil companies' initial lawsuit must be classified as a suit for partial, not total, breach insofar as it sought indemnification for past cleanup costs at the McColl site." *Id*.  And, as noted, the court rejected the government's argument that "the oil companies cannot now characterize the prior claims as claims for a partial breach when they originally elected to plead a total breach, thereby merging their demands for future damages into the judgment awarding past damages." *Id*.

On appeal, the government argues that, in *Shell I*, the Oil Companies "sought, among other past and future costs, the exact same future costs at issue in this case."  Appellant's Br. 11.  According to the government, because the *Shell I* court asserted jurisdiction over the entire complaint and issued a final judgment, "any future costs that the oil companies were seeking were either contained in that judgment or, specifically regarding the future costs the oil companies currently seek, were extinguished when the *Shell I* judgment became final." *Id*. at 11–12.  The government maintains that the dispositive question is not whether the future costs claimed in *Shell I* were viable, but whether they were asserted in the complaint and not dismissed with prejudice before judgment.  Specifically, it argues that, "[a]lthough the oil companies ultimately did not seek recovery for the future cost claims in *Shell I*, they never sought to dismiss them voluntarily, and the court entered a final

judgment for a sum certain that provided no basis to conclude that it was dismissing those abandoned claims without prejudice, which would be required to escape res judicata." *Id.* at 19.

The government's arguments on appeal are overly technical and ultimately unpersuasive. As an initial matter, it is worth noting what the government is *not* arguing. The government does not deny that its breach was partial. Nor does it suggest that the Oil Companies could have recovered the costs in this action in the prior *Shell I* litigation. Instead, the government takes the position that, regardless of whether the Claims Court *could* have awarded future damages in *Shell I*, any claims for such damages are now barred because the Oil Companies included a request for future damages in their *Shell I* complaint. We disagree.

First, it is worth noting that, despite the government's description of the complaint in *Shell I*, the Oil Companies never expressly asked for all future damages or alleged anything other than a partial breach. J.A. 101–02. The government claims that fact is of no moment because the Oil Companies' administrative claim included an estimate for future costs and requested a determination that the government would pay for costs incurred in the future. *See* J.A. 29. The fact that a party seeks final resolution of an ongoing dispute in an administrative filing does not mean that the actual complaint filed in court bars future claims on res judicata grounds, however.

Second, as the Claims Court correctly explained, "even if the oil companies in their complaint in the prior action had sought future costs, plaintiffs could not effectively elect to treat their claims for future costs as part of a total breach." *Shell II*, 148 Fed. Cl. at 791. Because contract law precludes recovery for speculative damages, the "mere fact that plaintiffs asserted those claims in their complaint in the first case did not make them viable claims." *Id.*

Accordingly, we agree with the Claims Court that any claims for future speculative damages "did not merge into the judgment rendered but were simply put aside and not reflected in, or addressed by, the judgment." *Id.*

The partial breach doctrine makes clear that damages that could not have been sought in a prior action because they had not yet accrued may be sought in a subsequent action. *Indiana Michigan*, 422 F.3d at 1377. As the Claims Court correctly explained, "the general rule is that when one party has performed its duties under a contract and the other party's obligations are ongoing, a breach by the latter party must be considered partial." *Shell II*, 148 Fed. Cl. at 791. And, because the government breached the Avgas Contracts decades after the Oil Companies finished performance, the Oil Companies "stood 'in the position of an annuitant or a creditor exacting payment from a debtor' and as such were 'compelled to wait for the installments as they severally mature.'" *Id.* For these reasons, we agree with the Claims Court that the partial breach doctrine was applicable here, notwithstanding the Oil Companies' request for future damages in *Shell I*.

The government argues that the Claims Court's reliance on *Indiana Michigan* was misplaced because there, the plaintiff sued for partial breach in the complaint. Appellant's Br. 17. In that case, which involved the government's breach of a standard contract for the disposal of spent nuclear fuel, Indiana Michigan sued the government, seeking both pre-breach mitigation costs and future damages. *Indiana Michigan*, 422 F.3d at 1371–72. The Claims Court denied Indiana Michigan's claimed damages, holding that, because Indiana Michigan claimed partial versus total breach, recovery for pre-breach mitigation costs and present recovery for future damages was precluded. *Id.* at 1373. On appeal, we held that Indiana Michigan's claim was for partial breach. We explained that, while "[f]uture damages could have been awarded had Indiana Michigan claimed total breach," "[i]f the breach is partial only, the

injured party may recover damages for nonperformance only to the time of trial *and may not recover damages for anticipated future nonperformance.*" *Id.* at 1376.

We then clarified how res judicata applies in the partial breach context. Noting that the government "agreed . . . that Indiana Michigan [could] maintain future suits," we held that, "[i]f the breach of an entire contract is only partial, the plaintiff can recover only such damages as he or she has sustained, *leaving prospective damages to a later suit in the event of further breaches.*" *Id.* at 1377 (quoting 22 Am. Jur. 2d Damages § 488 (2003)). Therefore, under *Indiana Michigan*, if a plaintiff brings a claim for partial breach, res judicata does not bar subsequent lawsuits to recover future damages for further breaching acts. *Id.*

While *Indiana Michigan* did not involve the exact same procedural posture as this case, it demonstrates that the partial breach doctrine applies to contract claims like the one here, and that subsequent partial breach claims will not be precluded by res judicata. We have consistently applied this principle, reiterating that a subsequent suit "is not barred by claim preclusion—regardless of whether the same transactional facts are present in both suits—to the extent [the party's] allegations are temporally limited to acts occurring after final judgment was entered in the first suit." *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1054 (Fed. Cir. 2014).

The bottom line is that a plaintiff cannot be precluded from bringing a claim that was unavailable in the first action—either because the breach was partial or because the conduct at issue had not yet occurred at the time of the first suit. *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (explaining that a prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"). This is true regardless of the relief sought in the first action. *See id.* (finding that the

prior suit did not bar the second, even though the first complaint sought "injunctive relief which, if granted, would have prevented the illegal acts" plaintiffs complained of in the second suit).  The government's arguments to the contrary are inconsistent with settled res judicata principles.  We therefore agree with the Claims Court that the Oil Companies' successive partial breach claim was not barred by res judicata.

## B.  The CSA

In 2011, Congress repealed the CSA.  The government maintains that this repeal deprived the Claims Court of jurisdiction to hear the Oil Companies' CSA claims, which were filed in 2019.  According to the government, the Oil Companies should have filed suit under the Contract Disputes Act or the Tucker Act.[3]  But Congress's repeal of the CSA included a savings clause: "The laws specified in the following schedule are repealed, except for rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of

---

[3]    The government acknowledges that the Oil Companies could have filed suit under Tucker Act, 28 U.S.C. § 1491(a)(1), and does not object to the trial court's exercise of jurisdiction over the Oil Companies' claims for cost reimbursement, except on res judicata grounds.  Appellant's Br. 11, n.2.  The question of whether the Claims Court had jurisdiction under the CSA is important, however, because the interest award to the Oil Companies was authorized by the CSA, 41 U.S.C. § 106(f), and interest is not available under the Tucker Act.  *See Richlin Sec. Serv. Co. v. Chertoff*, 437 F.3d 1296, 1299 (Fed. Cir. 2006) ("The Supreme Court has long held that 'interest cannot be recovered in a suit against the '[G]overnment in the absence of an express waiver of sovereign immunity from an award of interest.'" (quoting *Libr. of Congress v. Shaw*, 478 U.S. 310, 311 (1986)).

this Act." Pub. L. 111-350, 124 Stat. 3677, 3855 (Jan. 4, 2011). The parties dispute whether the savings clause applies to preserve the Oil Companies' CSA claims. Resolution of this issue turns on whether the rights and duties of the parties matured before the repealing statute was enacted. The Claims Court found that they did. We agree.

The Oil Companies' rights at issue and the government's corresponding duties stem from the indemnification provision in the Avgas Contracts. That provision provides that the government must pay "*any new or additional* taxes, fees, or *charges*" which the Oil Companies "may be *required by any* municipal, state, or *federal law* in the United States or any foreign country to collect or pay *by reason of the production*, manufacture, sale or delivery *of* [*avgas*]." *Shell II*, 148 Fed. Cl. at 785–86 (emphasis in original). Under this provision, the Oil Companies had a right to reimbursement and the government had a corresponding duty to indemnify. *Id.* at 794.

As the Claims Court explained, "[t]he contracts did not specify a precise time for performance." *Id.* Nor could they, given the "unforeseeable nature of the costs" contemplated. *Id.* But the Avgas Contracts make clear that the government has a duty to indemnify the Oil Companies when a "federal law" "required" the companies "to . . . pay" "new or additional . . . charges" "by reason of the production of" avgas. *Id.* at 785–86. Given this language, we agree with the Claims Court that the government's duty to indemnify was triggered, at the latest, when the Oil Companies were found liable under CERCLA due to their production of avgas. *Id.* at 794. It is undisputed that this occurred in the 1990s, "well before the CSA's repeal." *Id.*

On appeal, the government argues that, under the CSA's mandatory administrative claims process, it "had no duty to pay the oil companies' claims until they presented their termination claim to GSA in 2019." Appellant's Br. 22–23. According to the government, because the Oil

Companies had no "right" to sue under the CSA until they exhausted their administrative remedies, no "duty" to pay matured until after 2011. *Id.* at 23. We disagree.

The government seems to be drawing a distinction between its contractual duty to indemnify the Oil Companies under the Avgas Contracts—which is the relevant duty for purposes of the CSA's savings clause—and its CSA duty to resolve a termination claim submitted under that statute. Appellant's Br. 24. As the Claims Court explained, however, "[t]he CSA does not dictate when the rights and duties defined in a contract mature for purposes of the savings clause in the repealing statute; rather, it defines a set of procedural rules that are unrelated to the substantive legal obligations arising under an independent contractual agreement like the one here." *Shell II*, 148 Fed. Cl. at 795.

Under the terms of the Avgas Contracts, "the government's duty to pay any new or additional charges the oil companies incurred by reason of the production of avgas was not contingent on the oil companies' act of seeking reimbursement, but instead upon their incurrence of new liabilities dictated by federal law." *Id.* at 794. The government's contractual duties, within the meaning of the savings clause, matured (at the latest) when the Oil Companies were held liable under CERCLA to pay environmental remediation costs at the McColl site. If Congress had meant to limit the savings clause to claims that had been presented to the agency prior to the repeal, it could have done so. Instead, the savings clause preserves claims based on when the claimant's rights and the government's duties matured. Here, the plain language of the Avgas Contracts indicates that the government's duty to indemnify matured in tandem with the Oil Companies' liability under CERCLA.

The government cites *Tektel, Inc. v. United States*, 121 Fed. Cl. 680 (2015), for the proposition that it had no duty

to indemnify the Oil Companies until they exhausted the CSA's procedure.  But in *Tektel*, which is not binding on this court, the contract specifically required the plaintiff to exhaust administrative remedies before seeking judicial review.  *Id.* at 686.  As such, Tektel's right to seek judicial relief could not have matured until it had exhausted its administrative remedies, because those remedies were part of the contract.  Here, nothing in the Avgas Contracts requires the Oil Companies to comply with the CSA's procedures—let alone requires them to do so before they are entitled to indemnification.  Notably, the CSA was not enacted until years after the Oil Companies entered into the Avgas Contracts.

The government also submits that, under *G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963), statutory and regulatory provisions must be deemed included within government contracts by law if they are: (1) required; and (2) involve a "deeply ingrained strand" of procurement policy.  Appellant's Br. 26 (quoting *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993)).  We have recognized that "*Christian* stands for the proposition that if the parties to a government contract neglect to include a clause in the contract *that is otherwise required by regulation . . .* courts will read the clause into the contract as a matter of law." *Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1338 (Fed. Cir. 2013) (citing *Christian*, 312 F.2d at 426–27).  The government cites no authority establishing that exhaustion requirements were mandatory in government war contracts at the time of the Avgas Contracts.  And nothing suggests that the CSA mandated its procedures retroactively into the Avgas Contracts.  Accordingly, we find that *Christian* does not apply.

We agree with the Claims Court that the government's duty to indemnify the Oil Companies and the Oil Companies' right to reimbursement for remediation costs under the Avgas Contracts both matured well before the repealer statute's enactment.  The Claims Court therefore correctly

concluded that it had jurisdiction over the Oil Companies'
CSA claims.

### III. CONCLUSION

We have considered the government's remaining argu-
ments and find them unpersuasive. For the foregoing rea-
sons, we affirm the Claims Court's decision.

**AFFIRMED**